**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRENNA BOWERMAN a/k/a WREN BOWERMAN, <br><br> *Plaintiff,* <br><br> vs. <br><br> FELLINI AUTO SALES & SERVICE, LLC, <br><br> *Defendant.* | **ELECTRONICALLY FILED** <br><br> Case No.    23-2162 <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT IN CIVIL ACTION

Plaintiff, Brenna Bowerman a/k/a Wren Bowerman (hereinafter, "Plaintiff"), by and through the undersigned counsel, files the within Complaint in Civil Action against Defendant, Fellini Auto Sales & Service, LLC (hereinafter, "Defendant"), averring as follows:

## PARTIES

1. Plaintiff is an adult individual who resides at 704 Hamil Road, Verona, Pennsylvania 15147.

2. Furthermore, Plaintiff identifies as trans non-binary and uses the pronouns, "they, them".

3. Defendant is a limited liability company formed under the laws of Pennsylvania and owns and operates a used car dealership located at 2409 Saw Mill Run Boulevard, Pittsburgh, Pennsylvania 15234 (hereinafter, the "Dealership").

## JURISDICTION AND VENUE

**A.    This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 and Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (hereinafter, "Title VII"); and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (hereinafter, the "EPA")  (collectively, Plaintiff's claims arising under Title VII and the EPA are identified as the "Federal Law Claims").

5.      Plaintiff is also advancing claims under the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA"); the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.* ("WPCL"); and asserts Pennsylvania state common law claims for unjust enrichment (the "State Law Claims").  This Court may exercise supplemental jurisdiction over the State Law Claims pursuant to 28 U.S.C. § 1367(a) as the Federal Law Claims and the State Law Claims share operative facts that support the corresponding causes of action within the Federal Law Claims and the State Law Claims.  Further, the operative facts between the Federal Law Claims and the State Law Claims mirror one another to such a degree that they form the "same case or controversy" under Article III § 2 of the United State Constitution which further supports this Court's exercise of supplemental jurisdiction over the State Law Claims.

**B.      The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

6.      Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (the "Western District") as a substantial part of the events and omissions giving rise to the Federal Law Claims and State Law Claims occurred within this judicial district.  Specifically, these events and omissions occurred within Allegheny County, Pennsylvania which is one of the counties encompassed by the Western District.  This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in

2

Allegheny County, Pennsylvania and conduct arising within Allegheny, County is docketed within the Pittsburgh Division of the Western District pursuant to LCvR 3.

**C.    This Court May Exercise Personal Jurisdiction Over Defendant through Pennsylvania's Long-Arm Statute and This Exercise of Personal Jurisdiction Comports with the Traditional Notions of Fair Play and Substantial Justice.**

7.    This Court may exercise personal jurisdiction over Defendant as Defendant has the required minimum contacts with this forum for purposes of Pennsylvania's Long-Arm statute codified within 42 Pa. C.S. § 5322.  Further, the exercise of jurisdiction over Defendant by and through Pennsylvania's Long-Arm Statute complies with the traditional notions of fair play and substantial justice required by the Due Process Clause of the Constitution given the "specific jurisdiction" that exists over Defendant.

8.    At the outset, Pennsylvania's Long-Arm statute provides that a tribunal may exercise personal jurisdiction where an individual or entity is "transacting any business in this Commonwealth".  42 Pa.C.S. § 5322.

9.    The following enumerated subsections within 42 Pa. C.S. § 5322(a) define "transacting any business" to include:

> (1)(i) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an act.
> (1)(ii) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.
> (1)(iv) The engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by any government unit of this Commonwealth.
> (1)(v) The ownership, use or possession of any real property situate within this Commonwealth.
> (3) Causing harm or tortious injury by an act or omission in this Commonwealth
> (5) "having an interest in, using, or possessing real property in this Commonwealth

3

(10) committing any violation within the jurisdiction of this Commonwealth of any statue, home rule charter, local ordinance or resolution, or rule or regulation promulgated thereunder by any government unit or of any order of court or other government unit."

*Id.*

10.    In the instant matter, personal jurisdiction can be found over Defendant under Pennsylvania's Long-Arm Statute for the following reasons:

a.  Defendant maintains an office located in Pittsburgh, Pennsylvania, routinely engages in various commercial activities within the Commonwealth of Pennsylvania for the purpose of pecuniary gain; and

b.  As averred more fully below, Defendant violated numerous statutory provisions of federal and state law and the underlying events giving rise to Defendant's unlawful conduct, including the harm that Plaintiff sustained therefrom, occurred in Pennsylvania.

11.    This Court's exercise of personal jurisdiction over Defendant by and through Pennsylvania's Long-Arm Statute comports with the Due Process Clause of the Constitution through the "specific jurisdiction" that exists over Defendant as the causes of action complained of herein arise specifically from Defendant's contact with the forum.  U.S. Const. amend XIV, § 1.

12.    The inquiry into whether "specific jurisdiction" exists possesses three parts. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007).  First, a "defendant 'must have purposefully directed [its] activities' at the forum".  *Id.* quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).  Second, the instant litigation must "arise out of or relate to at least one of those activities".  *Id.* quoting *Helicopteros Nacionales de Colombia, S. A. v. Hall*,

4

466 U.S. 408, 414 (1984). And third, whether the exercise of jurisdiction "'comport[s] with fair play and substantial justice'". *Id.* quoting *Burger King*, 471 U.S. at 476.

13.    Defendant has engaged in business operations for pecuniary gain within the forum and these business operations were, at all times relevant hereto, intentionally effectuated by the Defendant. As more thoroughly delineated below, Plaintiff participated in these business operations, through an employment relationship, and correspondingly the Federal Law Claims and the State Law Claims arise from said relationship. Further, the Federal Law Claims and the State Law Claims arose because of these business operations and from the unlawful activity Defendant engaged in occurred within the scope of these operations.

14.    The exercise of personal jurisdiction exists over Defendant complies with the notions of "fair play and substantial justice" required by *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Given the operative facts occurred within this forum, the evidence and witnesses supporting both the Federal Law Claims and the State Law Claims are located primarily here. As such, this forum offers both Plaintiff and Defendant the most convenient and effective relief opposed to other forums and ensures each party may fairly access the evidence to support its claims and/or defenses.

15.    Therefore, personal jurisdiction over Defendant is proper in light of Defendant's consent to personal jurisdiction and Pennsylvania's Long-Arm Statute and Defendant may properly be pursued before this Court.

**D.    Plaintiff has exhausted its administrative remedies and the Federal Law Claims and the State Law Claims are now properly able to be brought before this Court.**

16.    Plaintiff has satisfied all procedural and administrative prerequisites under 29 U.S.C. § 626, 42 U.S.C. § 2000e-5, and 43 P.S. § 959 and now may proceed to bring this action before the Court. Specifically:

a. On or about March 28, 2023, Plaintiff dual filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for the Federal Law Claims and the State Law Claims at charge number 533-2023-01436 (the "EEOC Charge") and with the Pennsylvania Human Relations Commission (the "PHRC").

b. On October 2, 2023, the EEOC issued the Notice of Right to Sue (the "NRTS") wherein Plaintiff was afforded ninety days within which to timely file the Federal Law Claims and the State Law Claims.  A true and correct copy of the NRTS is attached hereto, made a part hereof, and identified as **Exhibit A**.  The instant Complaint is filed within the ninety-day time period.

### GENERAL ALLEGATIONS

17.     Plaintiff began their employment with Defendant in the position of customer service manager on or about August 16, 2022.

18.     Plaintiff learned of the position through their fiancé, Jack Fronce (hereinafter, "Mr. Fronce"), who began working for Defendant as Finance Manager on or about June 15, 2022.

19.     Defendant's General Manager, Arnes Bajgora (hereinafter, "Mr. Bajgora, Jr.") hired Plaintiff.

20.     Plaintiff was responsible for managing client issues and supporting the sales staff as well assisting the financial department by processing credit applications and securing lending for customers.

21.     Plaintiff began working for Defendant part time and was not initially paid for their work.

22.     Shortly after hiring Plaintiff, Mr. Bajgora, Jr. engaged in a pattern and practice of harassing Plaintiff and their fiancé, Mr. Fronce, by asking invasive questions and making unwelcome comments about their sexual relationship and gender identity.

23.     On numerous occasions beginning on or about August 19, 2022, Mr. Bajgora, Jr. alleged that Mr. Fronce had hickeys on his neck and openly accused Plaintiff of giving them to him which intensely embarrassed both Mr. Fronce and Plaintiff.

24.     Concurrent with the facts set forth above, Mr. Bajgora, Jr. also began accusing Mr. Fronce and Plaintiff of taking time off work, not to manage Mr. Fronce's asthma, a disability pursuant to the ADA, but to have sexual intercourse with Plaintiff.

25.     Responsive to the comments delineated above, Plaintiff objected to the comments and questions about his disabilities and their sex life.

26.     Further, Plaintiff told Mr. Bajgora Jr., that they both felt intense embarrassment when he [Mr. Bajgora, Jr.] raised the issue of their sex life.

27.     Despite the repeated complaints from Plaintiff, Mr. Bajgora, Jr. continued to levy harassing, derogatory and discriminatory comments to Plaintiff and Mr. Fronce about their sexual relationship.

28.     On September 9, 2022, Plaintiff complained to Mr. Bajgora Jr. about the lack of pay for their work and he responded by offering them Wendy's as payment.

29.     Plaintiff responded that their work was worth more than just Wendy's and Mr. Bajgora Jr. responded by providing Mr. Fronce with $25.00 in cash to bring home to Plaintiff.

30.     On or about September 29, 2022, Mr. Fronce suffered a concussion and took a two-day unpaid leave of absence from work in order to rehabilitate from same.

31. Further, on or about September 29, 2022, Mr. Bajgora, Jr. told Plaintiff, "If [Jack] wasn't at home f\*\*king [Wren] all day, he'd be able to come to work."

32. On or about September 29, 2022, Mr. Bajgora, Jr. threatened Mr. Fronce's employment and forced him to return to work on or about October 1, 2022, prior to fully healing.

33. On or about September 30, 2022, Mr. Bajgora Jr. finally began paying Plaintiff for their work, but in cash.

34. On or about October 1, 2022, Mr. Bajgora Jr. sat Plaintiff down and asked them, "How do you identify?" and continued, "What does that mean for you sexually?"

35. Plaintiff considered Mr. Bajgora's questions very harassing and they deflected them and ended the meeting as amicably and as quickly as they could.

36. On October 7, 2022, Plaintiff and Mr. Fronce complained to Mr. Bajgora, Jr. about treating Plaintiff as an extension of Mr. Fronce and Plaintiff not receiving the pay promised.

37. Plaintiff also emphasized the lack of respect for professional boundaries relative to personal relations and Mr. Fronce's Disabilities.

38. Mr. Bajgora, Jr. refused to receive their complaints inside the office and ushered Plaintiff and Mr. Fronce outside where they complained to him.

39. Mr. Fronce and Plaintiff continued discussing their complaints with Mr. Bajgora Jr. via text message throughout the day.

40. Mr. Bajgora Jr. texted that Plaintiff was inconsiderate and aggressive.

41. Plaintiff responded by complaining to Mr. Bajgora Jr. that he was "sexist" because he does not make such comments to employees who identify as male.

42. On or about October 10, 2022, Mr. Bajgora Jr. finally provided Plaintiff with a steady wage of $10.00 an hour, wherein they averaged thirty (30) to thirty-five (35) hours a week.

43.     Mr. Bajgora also promised Plaintiff additional compensation for performing additional duties, which they did, such as a bonus of $40 per sale for helping a blind coworker, George Szabo (hereafter, "Mr. Szabo") with sales.

44.     Plaintiff relied on the promises, but never received the bonuses.

45.     On or about October 15, 2022 through October 21, 2022, Mr. Fronce took time off from work due to a high fever related to a respiratory infection stemming from his Asthma Disability.

46.     Mr. Bajgora, Jr. continued to make unwelcome comments to Plaintiff and Mr. Fronce about the legitimacy of Mr. Fronce taking time off due to his Disabilities and told him not to come back to work until Mr. Fronce could produce a detailed doctor's diagnosis.

47.     Contemporaneously therewith, Mr. Bajgora, Jr. continued to make allegations that Mr. Fronce was just staying home in order to have sex with Plaintiff.

48.     On or about October 15, 2022, Plaintiff consulted the Equal Employment Opportunity Commission (hereinafter, "EEOC") website and proceeded to review the ADA laws set forth therein.

49.     Thereafter, armed with the ADA information and knowledge, Plaintiff complained to Mr. Bajgora, Jr., that he was being too invasive and could not bar Mr. Fronce from returning to work pending a medical diagnosis.

50.     Upon Mr. Fronces's resistance to the above, Mr. Bajgora, Jr. responded, "I am the boss and I can do what I want."

51.     Subsequent to the immediately foregoing statements, Plaintiff and Mr. Bajgora, Jr. discussed accommodating Mr. Fronce's Disabilities for nearly an hour, to wit, ultimately, Plaintiff

told Mr. Bajgora, Jr. that if he continued the harassment, Mr. Fronce would proceed to retain a lawyer and initiate legal action.

52. In response to the immediately foregoing, Mr. Bajgora, Jr. threatened Plaintiff's employment by stating, "You won't have a job very long." Plaintiff responded by telling Mr. Bajgora Jr. that it would be unlawful for him to retaliate.

53. On or about September 23, 2022, Mr. Bajgora Jr. increased Mr. Fronce's sales's commission from 28% to 30%.

54. Mr. Bajgora Jr. stated that the raise would also apply to Plaintiff because they resided together.

55. October 17, 2022, Plaintiff complained to Mr. Bajgora Jr. that they should be paid as individual and not through Mr. Fronce.

56. In response, Mr. Bajgora Jr. increased Plaintiff's hourly rate from $10.00 to $13.00 per hour but then revoked Mr. Fronce's commission raise, which resulted in their household bringing in less money overall.

57. Throughout October of 2022, Plaintiff made multiple complaints to Mr. Bajgora Jr. about "discriminatory" pay because of their gender identity.

58. Plaintiff complained that they receive $80.00 for selling a car and female coworker, Brandi Singleton (hereinafter, "Ms. Singleton") received $100 while Mr. Szabo received $200 per sale despite Plaintiff assisting him with the required reading and writing related to his sales.

59. Mr. Bajgora Jr. explained the difference in pay by claiming Mr. Szabo had more sales experience and he was "like a father to him."

60. Ms. Singleton ultimately resigned due to unequal pay and lack of respect from management.

61.     On or about October 19, 2022, Mr. Fronce and Mr. Bajgora, Jr. had an email exchange wherein Mr. Fronce stated he would return to work with medical details about his disability although he was not legally obligated to do so.

62.     On or about October 21, 2022, Mr. Fronce returned to work with a medical excuse setting forth that he was clear to return to work and that his illness was due to an "asthma exacerbation."

63.     After returning to work, Mr. Fronce discussed his disabilities in greater detail with Mr. Bajgora, Jr. and his father, the owner of Fellini, Agron Bajgora (hereinafter, "Mr. Bajgora, Sr.") because he was in fear of being terminated from his job.

64.     On or about October 21, 2022, Mr. Bajgora, Sr. aggressively approached Plaintiff and Mr. Fronce while they began taking a break in their car approved by Mr. Bajgora Jr.

65.     Mr. Bajgora Sr. aggressively opened the car door and yelled, "Why are you not at work?!"

66.     Plaintiff and Mr. Fronce explained that they had permission for the break.

67.     Mr. Bajgora Sr. told Plaintiff that they needed to "clock out," they were "wasting time" and called Plaintiff a "Snake."

68.     Apparently, Mr. Bajgora, Sr. was upset because the Fellini business telephone rang and Plaintiff was not present to answer it.  Notably, the internal policy was that if the telephone rings three (3) times in succession, any available Fellini personnel can and should answer it. Nobody else picked it up.

69.     Mr. Bajgora Sr. forced Plaintiff and Mr. Fronce to end their break prematurely and they went back inside the Dealership.

11

70.     Mr. Bajgora, Sr. was incensed and continued to yell at Plaintiff about not answering the phone and continued to refer to Plaintiff as a "a Snake, a Liar."

71.     Plaintiff complained to Mr. Bajgora Sr. about discrimination, specifically that he was yelling at them and not Mr. Fronce.

72.     Mr. Bajgora Sr. responded to the complaint, saying, "He's different."

73.     Plaintiff asked, "Why is he different?"

74.     Mr. Bajgora Sr., repeated, "He's different."

75.     Due to the yelling and name calling from Mr. Bajgora Sr., Plaintiff suffered a panic attack in the back office and was consoled by parts manager, Amanda (last name unknown), who agreed with Plaintiff that Mr. Bjgora Sr. was "sexist."

76.     Plaintiff recovered to a degree and sought out Mr. Bajgora Jr. to complain to him about his father, but Mr. Bajgora Sr. physically blocked them from reaching his son.

77.     As a result of the preceding action, Plaintiff and Mr. Fronce left the Dealership prior to the end of their shift due to the intolerable and uncorrected harassment.

78.     Later that night Plaintiff texted Mr. Bajgora Jr., wherein they tendered their resignation, a constructive discharge.

79.     Mr. Fronce continued to work up to November 15, 2022, when he was constructively discharged due to intolerable verbal harassment, cursing and name calling from Mr. Bajgora, Jr. and Mr. Bajgora, Sr. relating to his sexual orientation and disabilities.

<u>COUNT I</u>
**DISCRIMINATION ON THE BASIS OF SEX AND SEXUAL ORIENTATION
IN VIOLATION OF TITLE VII AND THE PHRA
42 U.S.C. § 200e, *et seq.*; 43 Pa. Cons. Stat. § 951, *et seq.***

80.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

81.    To establish a *prima facie* case of discrimination on the basis of sexual orientation, a plaintiff must established that: (1) they are a member of a protected class; (2) were qualified for the position which they held; (3) that they suffered an adverse employment action; and (4) which were taken under circumstances giving rise to an inference of discrimination. *Emerson v. Stern & Eisenberg, P.C.*, No. 21-3096, 2022 BL 370742, at \*4 (E.D. Pa. Oct. 17, 2022) citing *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015) (citation omitted).

82.    It is well-established that Title VII applies to claims of discrimination on the basis of sexual orientation. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 , 1737 , 207 L. Ed. 2d 218 (2020).

**A.    Plaintiff is a Member of Protected Classes on the Basis of His Gender and Sexual Orientation.**

83.    At all times relevant hereto, Plaintiff was biologically born female and identifies as trans non-binary and uses the pronouns, "they, them" for purposes of their sexual orientation.

**B.    Plaintiff was Qualified for the Position.**

84.    At all times relevant hereto, Plaintiff was exceedingly qualified for the position of Finance Manager with Defendant.

85.    Plaintiff possessed and exercised the skill, experience, and ability needed to perform the essential functions of the position of Finance Manager. Specifically, Plaintiff was sufficiently skilled in the areas of comprehension, communication, interpretation, and analysis needed to perform the essential functions of the Finance Manager position and to exchange ideas with their supervisory personnel concerning the needs of the Finance Manager position.

86.    Moreover, Plaintiff's qualification for the Finance Manager position is evidenced by Plaintiff's successful completion of the job to Defendant's satisfaction for nearly two (2) months.

13

C.      **Plaintiff Suffered Discriminatory Pay.**

87.     Plaintiff is a biological female who identifies as trans non-binary.  In contrast, Mr. Fronce and Mr. Szabo are biological males.

88.     Plaintiff, Mr. Fronce and Mr. Szabo all performed substantially the same job duties and tasks at Defendant's Dealership that required the same—or substantially the same—amount of skill, effort, and responsibility.

89.     However, Plaintiff was not compensated by Defendant from August 16, 2022, through September 30, 2022; although Defendant compensated Mr. Fronce and Mr. Szabo accordingly during said period of time.

90.     Moreover, on or about September 23, 2022, Defendant raised Mr. Fronce's sales' commission rate from 28% to 30%, bizarrely relaying to Mr. Fronce that – since he and Plaintiff resided together – it was a raise for all of them.

91.     On or about October 10, 2022, Defendant began compensating Plaintiff at the rate of $10.00 per hour.

92.     However, at that time, Mr. Szabo was being compensated on an hourly wage basis in addition to sales commissions wherein Mr. Szabo was compensated $200.00 per sale.

93.     Pertinent here, Mr. Baigora, Jr., had promised to pay Plaintiff commissions on sales for which they contributed, as Plaintiff was assisting Mr. Szabo as noted above.

94.     On or about October 17, 2022, Plaintiff complained to Defendant about the inequity of stating that Mr. Fronce's raise in sales' commission referenced above was essentially "for" Mr. Fronce and Plaintiff.

14

95.     Shortly thereafter, Defendant raised Plaintiff's hourly rate from $10.00 to $13.00. However, Defendant contemporaneously revoked Mr. Fronce's above-stated increase in sales' commission.

96.     Consequently, Defendant violated Title VII  in failing to pay Plaintiff for equal work on account of Plaintiff's gender.

97.     As stated more thoroughly above, Plaintiff was subjected to severe and/or pervasive hostile work environment due to their gender, sexual orientation, and advocating for their fiancé's rights relating to his disability.  Furthermore, on or about October 21, 2022, Plaintiff suffered the ultimate "adverse employment action" in that they were constructively discharged.

**D.     Plaintiff Suffered Adverse Employment Actions Because of a Discriminatory Animus.**

98.     As averred above, Mr. Baigora, Jr. and Mr. Baigora, Sr. subjected Plaintiff to a hostile work environment via their harassing actions and discriminatory behavior on the basis of Plaintiff's gender, sexual orientation, and advocating for their fiancé's rights relating to his disability

99.     Specifically, Mr. Baigora, Jr. and Mr. Baigora, Sr. engaged in a pattern and practice of harassing Plaintiff by asking invasive questions and making unwelcome comments about their sexual relationship and gender identity.

100.     Given the explicit discriminatory animus harbored by Mr. Baigora, Jr. and Mr. Baigora, Sr. and their respective roles in the facilitation of the adverse employment actions described above, a sustainable inference readily arises that Plaintiff suffered the adverse employment actions due to discrimination in satisfaction of the final prong of their *prima facie* burden.

15

101.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## COUNT II
## PAY DISCRIMINATION IN VIOLATION OF
## THE EPA, 29 U.S.C. § 206(d)

102.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

103.    The EPA prohibits discrimination "on the basis of sex by paying wages to employees … at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex … for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.…"  29 U.S.C. § 206(d)(1).  See *Alja-Iz v. United States V.I. Dep't of Educ.*, 626 Fed. Appx. 44, 47 (3d Cir. 2005).

104.    Under the EPA, "[t]he plaintiff must first establish a *prima facie* case by demonstrating that employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000).

105.    "The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical.  The

16

inquiry then turns to whether the differing or additional tasks make the work substantially different." *Brobst v. Columbus Services Int'l*, 761 F.2d 148, 156 (3d Cir. 1985).

**A.     Plaintiff was Paid Differently for Performing Equal Work than that of Defendant's Opposite Sex Employees.**

106.    Plaintiff is a biological female who identifies as trans non-binary.  In contrast, Mr. Fronce and Mr. Szabo are biological males.

107.    Plaintiff, Mr. Fronce and Mr. Szabo all performed substantially the same job duties and tasks at Defendant's Dealership that required the same—or substantially the same—amount of skill, effort, and responsibility.

108.    However, Plaintiff was not compensated by Defendant from August 16, 2022, through September 30, 2022; although Defendant compensated Mr. Fronce and Mr. Szabo accordingly during said period of time.

109.    Moreover, on or about September 23, 2022, Defendant raised Mr. Fronce's sales' commission rate from 28% to 30%, bizarrely relaying to Mr. Fronce that – since he and Plaintiff resided together – it was a raise for all of them.

110.    On or about October 10, 2022, Defendant began compensating Plaintiff at the rate of $10.00 per hour.

111.    However, at that time, Mr. Szabo was being compensated on an hourly wage basis in addition to sales commissions wherein Mr. Szabo was compensated $200.00 per sale.

112.    Pertinent here, Mr. Baigora, Jr., had promised to pay Plaintiff commissions on sales for which they contributed, as Plaintiff was assisting Mr. Szabo as noted above.

113.    On or about October 17, 2022, Plaintiff complained to Defendant about the inequity of stating that Mr. Fronce's raise in sales' commission referenced above was essentially "for" Mr. Fronce and Plaintiff.

114.    Shortly thereafter, Defendant raised Plaintiff's hourly rate from $10.00 to $13.00. However, Defendant contemporaneously revoked Mr. Fronce's above-stated increase in sales' commission.

115.    Consequently, Defendant violated the EPA in failing to pay Plaintiff for equal work on account of Plaintiff's gender.

116.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and she is entitled to compensatory damages for these injuries.

117.    Moreover, when an employer has violated the EPA, there is a presumption that the aggrieved employee should receive liquidated damages, equal to the amount of the lost backpay, as "a matter of course." *EEOC v. Altmeyer's Home Stores*, 698 F. Supp. 594, 600 & 604 (W.D. Pa. 1988).  An employer may then defend against liquidated damages "by establishing that [it] acted in good faith and had reasonable grounds to believe that [it] was not in violation of the statute." *Id.* at 600-01.

118.     By effectuating a policy of intentional discrimination on the basis of gender, Defendant committed a malicious and reckless act of discrimination and cannot establish that it acted in good faith and had reasonable grounds to believe that it was not violating the EPA.  As such, an award of liquidated damages is warranted.

119.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment

18

and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

**COUNT III**
**FAILURE TO REMIT COMMISSIONS AND BONUSES IN**
**VIOLATION OF THE WPCL**
**43 P.S. § 260.1 *et seq.***

120.    Plaintiff incorporates the allegations contained in in the paragraphs above, as if fully set forth at length herein.

121.    The WPCL provides the employee with a statutory remedy to enforce its rights where an employer breaches its fundamental contractual obligation to pay wages owed to said employee.  See *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990).

122.    The contract between the employer and the employee governs the determination of the specific wages earned by the employee.  *Id.*, citing *Sendi v. NCR Comten, Inc.*, 800 F.2d 1138 (3d Cir. 1986).

123.    This statutory remedy created by the WPCL established both a private cause of action to any employee to whom "any type of wages" are owed and bestowed "any court of competent jurisdiction" with the power to maintain such an action.  43 P.S. § 260.9a(b).

124.    To recover under the WPCL, a Plaintiff must demonstrate: (1) a contractual entitlement; (2) to compensation from wages; and (3) a failure to pay that compensation."  *Carlson v. Qualtek Wireless LLC*, No. 22-125, 2022 BL 277728, at *14 (E.D. Pa. Aug. 10, 2022)

125.    Further, an employee must establish "an implied oral contract between the employee and the employer".  *Id.*

19

126.    The WPCL defines an "employer" to include every person, "association," or "corporation" and, further, "any agent or officer of any [corporation] employing any person in this Commonwealth."

127.    Defendant is a business "association" and/or "corporation" that employs individuals, including Plaintiff, within the geographic boundaries of the Commonwealth of Pennsylvania and, therefore, is an "employer" under 43 P.S. § 260.2a.

128.    As averred repeatedly throughout this Complaint, Defendant and Plaintiff have effectuated an employment relationship, whereby Plaintiff was an "employee."  This factual reality remains true for purposes of the WPCL as well.

129.    The WPCL defines "wages" to include all "earnings of an employee" and further includes within this definition any "fringe benefits or wage supplements."  43 P.S. § 260.2a.

**A.    Plaintiff and Defendant Engaged in a Contract for Plaintiff's Employment in Exchange for an Hourly Pay Structure and Payment of the Promised Bonus and Sales' Commission Payments**

130.    On or about October 4, 2022, Plaintiff and Mr. Baigora, Jr. entered into an Employment Contract wherein Plaintiff would perform additional duties which would contribute directly to the Dealership's sales profits and, following receipt of said services, i.e. upon closing a sale, Defendant would compensate Plaintiff in the form of sales' commission payments.  However, Plaintiff never received said sales' commission payments.

131.    As set forth above, on or about October 10, 2022, Plaintiff and Mr. Baigora, Jr. entered into an Employment Contract wherein Plaintiff would perform additional duties, specifically, Plaintiff would assist Mr. Szabo in his job duties, and Defendant, following receipt of said services would provide Plaintiff additional compensation in the form of bonus payments.  However, Plaintiff never received said bonus payments.

**B.      Plaintiff Has Accrued Owed Compensation From Defendant in the Form of the Promised Bonuses and Sales' Commission Payments.**

132.    As previously averred throughout this Complaint, Plaintiff and Defendant have effectuated an employment relationship; therefore, per Plaintiff's and Defendant's Employment Contract, Plaintiff was due to be paid the promised bonuses and sales' commissions.

**C.      Defendant Has Failed to Remit Plaintiff Their Owed Bonus and Sales' Commission Payments.**

133.    On or about August 16, 2022, Plaintiff commenced their employment with Defendant, and was subsequently owed the bonus and sales' commission payments.

134.    As of the date of filing this Complaint, Plaintiff has yet to receive their contractually obligated bonus and sales' commission payments.

**D.      Plaintiff is Entitled to Reasonable Attorney's Fees and Costs Incurred in Pursuit of Their Unpaid Wages.**

135.    In addition, 43 P.S. § 260.9a(f) mandates that where a Plaintiff obtains a favorable judgment, the Plaintiff is entitled, as a matter of right, to an award of attorney's fees:

> The court in any action brought under this section shall, in addition to any judgment awarded to the Plaintiff or Plaintiffs, allow costs for reasonable attorneys' fees of any nature to be paid by the defendant.

43 P.S. § 260.9a(f).

136.    As such, Plaintiff is also entitled to reasonable attorney's fees pursuant to 43 P.S. § 260.9a(f) that were incurred as a result of redressing Defendant's conduct described hereinabove.

137.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

21

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## COUNT IV
## UNJUST ENRICHMENT IN VIOLATION OF
## PENNSYLVANIA COMMON LAW

138.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

139.    Pennsylvania recognizes the equitable doctrine of unjust enrichment wherein the courts may imply a "quasi contract" and require a defendant to compensate the plaintiff for the value of the benefit conferred.  *Curley v. Allstate Ins. Co.*, 289 F. Supp. 2d 614, 619 (E.D. Pa. 2003), *citing Crawford's Auto Center v. State Police*, 655 A.2d 1064, 1070 (Pa. Cmwlth. 1995).

140.    A plaintiff must show three elements to prove a cause of action of unjust enrichment: (1) a benefit conferred on a defendant by the plaintiff; (2) appreciation of such benefits by the defendant; and (3) acceptance and retention of such benefits by the defendant under such circumstances that it would be inequitable for the defendant to retain the benefit without paying its value. *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999), citing *Schenck v. K.E. David, Ltd.*, 666 A.2d 327 (Pa. Super. 1995).

**A.    Plaintiff Conferred a Benefit Upon Defendant for Performing Their Workplace Duties and Defendant Appreciated the Benefit Plaintiff Conferred.**

141.    Plaintiff conferred a benefit to Defendant by performing the additional workplace duties set forth in Count III above, wherein they devoted hours of work that directly resulted in the financial and operational benefit of Defendant's business.

142.    Indeed, Plaintiff's performance of said additional duties for which they were promised bonus and/or sales' commission payments for which they never received said payments,

22

as detailed and described above in Count III, constitutes a benefit that was directly conferred to Defendant.

**B.     Defendant Accepted the Benefits Plaintiff Conferred and it is Inequitable for Defendant to Retain Those Benefits Without Compensating Plaintiff.**

143.    Defendant retained and accepted the benefit of Plaintiff's labor and services without issue, objection, or delay.

144.    Further, by accepting Plaintiff's labor and services and failing to pay Plaintiff the promised bonus and/or sales' commission payments, Defendants has been unduly enriched.

145.    As a matter of justice, it would be manifestly unjust and inequitable for Defendant to retain the benefit of the above-mentioned labor and services hours without paying Plaintiff due compensation.

146.    Defendant's actions described hereinabove were the direct and proximate cause of Defendant's unjust enrichment and the damages it owes Plaintiff for retaining a benefit without paying for its value.

147.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

<u>**REQUEST FOR RELIEF**</u>

Plaintiff, Brenna Bowerman a/k/a Wren Bowerman, respectfully requests this Honorable Court to enter judgment in his favor, and against Defendant, Fellini Auto Sales & Service, LLC, and prays for relief as follows:

1. Declare and find that Defendant committed one or more of the following acts:

   i. Violated Title VII and/or the PHRA in discriminating against Plaintiff on the basis of their gender and sexual orientation;

   ii. Violated Title VII and/or the EPA in discriminatorily compensating Plaintiff less than that of their male coworkers;

   iii. Violated the WPCL in failing to pay Plaintiff the promised bonus and/or commission payments;

   iv. Was unjustly enriched at Plaintiff's expense and unlawfully retained a benefit without paying for its value;

2. Award compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life;

3. Award punitive damages to Plaintiff in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature;

4. Award equitable relief in form of back pay and front pay;

5. Award liquidated damages to Plaintiff in an amount to be determined at trial;

6. Award reasonable attorney fees and costs to Plaintiff incurred in the prosecution of this suit; and/or

7. Award pre-judgment and continuing interest as calculated by the Court.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: December 28, 2023                    By: */s/ Erik M. Yurkovich*
                                           Erik M. Yurkovich (Pa. I.D. No. 83432)

                                           The Workers' Rights Law Group, LLP
                                           Foster Plaza 10
                                           680 Andersen Drive, Suite 230
                                           Pittsburgh, PA 15220
                                           Telephone: 412.910.8057
                                           Fax: 412.910.7510
                                           erik@workersrightslawgroup.com

                                           *Counsel for Plaintiff, Brenna Bowerman a/k/a Wren Bowerman*

25

**VERIFICATION**

I, Brenna Bowerman a/k/a Wren Bowerman, have read the foregoing allegations in the foregoing Complaint in Civil Action and verify that the statements therein are correct to the best of our personal knowledge, information and/or belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities, which provides that if we knowingly make false averments, we may be subject to criminal penalties.


Dated: 12 / 28 / 2023

Plaintiff, Brenna Bowerman a/k/a Wren Bowerman